E-FILED
Monday, 03 August, 2020  04:53:00 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| BRADLEY B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-cv-01174 |
| v. | ) | |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER & OPINION

This matter is an appeal from the Administrative Law Judge's (ALJ) decision to deny the request of Plaintiff Bradley B. for disability benefits under the Social Security Act. Before the Court is Plaintiff's Motion for Summary Remand (doc. 18) and the Defendant Commissioner Andrew Saul's Motion for Summary Affirmance (doc. 23). Plaintiff has filed his reply. (Doc. 24). This matter is therefore ripe for review. For the following reasons, Plaintiff's motion is granted, and Defendant's motion is denied.

### BACKGROUND

### I. Procedural History

Around March 10, 2016, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (R. at 15, 144).[1] Plaintiff alleges the disability began on April 20, 2013, and is due to severe back pain; a detailed summary

---

[1] Citation to "R. at __" refers to the page in the certified transcript of the record of proceedings provided by the Social Security Administration.

of his condition is provided below. (R. at 15, 144, 188). The Social Security Commissioner denied Plaintiff's application on July 13, 2016, and again on reconsideration on October 21, 2016. (R. at 15, 80, 86). Plaintiff requested a hearing by an ALJ, which took place on March 8, 2018. (R. at 15, 28, 93). Plaintiff (represented by an attorney) and a vocational expert (VE) testified at the hearing; there were no other witnesses. (R. at 30–58).

On May 8, 2018, the ALJ issued a decision affirming the Commissioner's previous decisions, concluding Plaintiff was not disabled and therefore was ineligible for disability benefits. (R. at 15–23). The Social Security Administration Appeals Council denied Plaintiff's request for review of the ALJ's decision, rendering the Commissioner's decision final. (R. at 1). Plaintiff thereafter filed the instant Complaint on May 24, 2019. (Doc. 1).

## II. Factual History

The following is a detailed summary of Plaintiff's medical records, Social Security Commissioner findings, Plaintiff's hearing with the ALJ, and the ALJ's final decision.

Prior to Plaintiff's alleged disability onset date of April 20, 2013, he worked as an auto parts salesman and mechanic, which, among other things, required him to repair trucks, install replacement parts on vehicles, unload supply deliveries, and stock shelves. (R. at 175–78, 185). At that time, Plaintiff was 39 years old, possessed a ninth-grade education, could read and write English, and could perform basic math calculations. (R. at 38, 185, 189). Plaintiff left his job on the alleged onset date and has not held gainful employment since. (R. at 189).

2

Plaintiff first visited a physician for back pain on December 8, 2015. (R. at 248). Describing his symptoms, Plaintiff told Dr. Robert Adams the pain was 8 out of 10 in intensity and became worse with physical movement and bending but did not worsen with coughing or bowel movements. (R. at 248). Dr. Adams made the following observations: positive back pain, positive straight-leg test in the sitting position, decreased bilateral patellar reflexes, decreased range of motion secondary due to lumbar pain, and radiculopathy consistent with right-sided sciatica.[2] (R. at 249). However, Dr. Adams found no issues with foot drop, "no significant weakness," normal gait, and an ability to "heel and toe walk without any difficulty." (R. at 248, 249). Ultimately, Dr. Adams diagnosed Plaintiff with sciatica on Plaintiff's right side, myalgia, and myositis, for which he prescribed Flexeril, Valium, Ultram, and Deltasone. (R. at 250, 251). Dr. Adams also made note of other ongoing issues, including a history of colonic polyps, lung disease, dyspepsia, and tobacco use disorder. (R. at 250).

---

[2] Radiculopathy is, generally, a "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." *Radiculopathy*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020). Lumbar radiculopathy is "any disease of lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias"; "[o]ne type is sciatica." *Id.* And lumbosacral radiculopathy is a "disease of nerve roots of the lumbar and sacral segments of the spinal cord." *Id.* Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and along the posterior or lateral aspect of the lower limb; it is most often caused by protrusion of a low lumbar intervertebral disk. The term is also used to refer to pain anywhere along the course of the sciatic nerve." *Sciatica*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020). "Sciatica most commonly occurs when a herniated disk, bone spur on the spine or narrowing of the spine compresses part of the nerve." *Sciatica,* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435 (last visited June 8, 2020).

Dr. Adams also ordered X-rays of Plaintiff's lumbar spine. (R. at 251, 262–63). The evaluating physician assessed only "[m]ild degenerative changes" without any acute findings. (R. at 263). The X-ray imaging also revealed Schmorl nodes on the superior endplates of the T11, T12, L1, and L2 vertebrae, marginal osteophytes between the L3–L4 and L4–L5 vertebrae, maintained intervertebral disc heights, and intact sacroiliac joints.[3] (R. at 263).

On referral, Plaintiff next visited pain specialist Dr. Avni Gupta at PRM Pain Clinic on December 18, 2015. (R. at 266). On a new patient questionnaire, Plaintiff stated he had experienced back and leg pain for 2.5 years, which was worsened by walking, standing, sitting, and bending forward. (R. at 279). On a 0–10 scale, Plaintiff reported the pain intensity in the past month was on average a 6 and at worst a 10 (later with Dr. Gupta, Plaintiff reported a range of 4–9). (R. at 266, 280). Plaintiff also reported the pain had completely interfered with his normal work abilities, sleep, and enjoyment of life (10/10); substantially interfered with his general activity (7/10); and moderately interfered with his walking ability (6/10). (R. at 280). In the prior 24

---

[3] A Schmorl node (SN) "is the herniation of nucleus pulposus through the cartilaginous and bony end plate into the body of the adjacent vertebra. SNs are common findings on imaging, and although most SNs are asymptomatic, some have been shown to become painful lesions." Kwaku A. Kyere et. al., *Schmorl's Nodes*, 21(11) Eur. Spine J. 2115 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3481099/. Osteophytes are bone spurs, which "often form where bones meet each other—in your joints. They can also form on the bones of your spine." *Bone Spurs*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212#:~:text=Bone%20spurs%20(osteophytes)%20often%20form,can%20go%20 undetected%20for%20years (last visited July 22, 2020). "[B]one spurs can narrow the space that contains your spinal cord. These bone spurs can pinch the spinal cord or its nerve roots and can cause weakness or numbness in your arms or legs." *Id.*

hours, he reported medication had provided a 50 percent reduction in pain. (R. at 279).

Dr. Gupta noted Plaintiff suffered from back pain but was generally alert, had a normal gait, and was under no acute distress. (R. at 268–69). Plaintiff's straight-leg test in the sitting position was negative for radicular pain, but his tests for palpitation over the lumbar spine and paraspinous muscles and for facet loading and back extension and rotation were both positive. (R. at 269). In addition to Plaintiff's ongoing issues, Dr. Gupta diagnosed degenerative disc disease, lumbar radiculopathy and lumbar facet arthropathy.[4] (R. at 269–70). Noting Plaintiff had not responded well to "conservative" treatment measures, Dr. Gupta stated Plaintiff would be a "good candidate for interventional pain management," involving a "multidisciplinary approach with injections, medications," and physical therapy. (R. at 269). Plaintiff was also prescribed Neurontin (gabapentin). (R. at 270).

On December 23, 2015, an MRI of Plaintiff's lumbar spine confirmed the presence of multiple, chronic Schmorl nodes through the lumbar spine, a " somewhat congenitally narrow central canal due to short pedicles which exacerbates the effects of the relatively minimal degenerative change," miniscule foraminal disc protrusion between the L2–L3 vertebrae, small disc bulges and mild facet arthropathy between the L4–L5 vertebrae, and small disc bulges between the L5–S1 vertebrae. (R. at 273). Most notably, the evaluating physician determined the MRI showed "[m]ild

---

[4] Facet arthropathy is "a type of spondylarthritis centered in facet joints, with disk degeneration and pain; it is most common in the lumbar region and also occurs in the cervical region." *Facet osteoarthritis, facet joint osteoarthritis*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020).

degenerative change most pronounced at L3–L4 where there is narrowing of the thecal sac without overt central stenosis. There is bilateral neuroforaminal stenosis at this level as well."[5] (R. at 273).

On January 7, 2016, Plaintiff again visited PRM Pain Clinic to meet with Nurse Practitioner (NP) Tracy Schierer. (R. at 270). Subjectively, Plaintiff reported his treatment regimen had provided no pain relief but reported his current pain intensity was 0 on a 0–10 scale. (R. at 271). Plaintiff also reported receiving pain relief injections, taking his medications without adverse effects, but not engaging in physical therapy or home exercise. (R. at 271). A physical examination revealed normal gait and no limits on peripheral joint movement. (R. at 274). However, Plaintiff's straight-leg tests in the sitting position, palpation over the lumbar spine and paraspinous muscles, and facet loading and back extension and rotation were all positive. (R. at 274). In addition to noting the results of the MRI, the final assessment made note of lower back pain shooting down Plaintiff's right leg, causing intermittent leg weakness that worsened with bending. (R. at 274). Plaintiff's prescriptions were not changed as a result of this visit. (R. at 275).

In a follow-up with Dr. Adams on January 11, 2016, Plaintiff reported the pain was 5/10 when sedentary but up to 8–9/10 with certain movement. (R. at 254). Dr.

---

[5] Stenosis is "an abnormal narrowing of a duct or canal." *Stenosis*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020). Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication. The condition may be either congenital or due to spinal degeneration." *Id.*

Adams again found normal gait, no foot drop, and no muscoskeletal weakness. (R. at 254–55). Dr. Adams did, however, maintain the ongoing relevant diagnoses of lower back pain, degenerative disc disease in the lumbar, lumbar radiculopathy, lumbar facet arthropathy, myalgia, myositis, and sciatica. (R. at 255–56). Dr. Adams also added Norco to Plaintiff's prescriptions but discontinued his Deltasone prescription. (R. at 255).

On February 22, 2016, Plaintiff again met with Dr. Adams. (R. at 257). Plaintiff noted his current pain was a 5/10 intensity level, and his symptoms were aggravated by bending, lying down, and twisting. (R. at 258). Dr. Adams noted this pain level was "moderate." (R. at 258). Plaintiff reported his pain caused stiffness all day, worsened at night, and his treatment "provided mild relief." (R. at 258). After another physical examination, Dr. Adams noted the presence of lower back pain, myalgia, and "[m]ildly abnormal gait," but he also noted there was no musculoskeletal weakness, no joint stiffness, and no foot drop. (R. at 259). Dr. Adams continued most of Plaintiff's medications (Norco, Flexeril, and Valium) but ended his Ultram and Neurontin (gabapentin) prescriptions. (R. at 259–60).

On June 17, 2016, Plaintiff was referred to physical therapy with PT Andrew Odenwald. (R. at 292). On that day, Plaintiff noted his current pain level was 5–6/10, his worst pain was a 9/10, and his best pain was 5/10. (R. at 293). PT Odenwald's final assessment was Plaintiff demonstrated weakness, pain, impaired range of motion, and decreased weight bearing on his right side. (R. at 294). PT Odenwald also noted Plaintiff had a history of falls but did not consider him a fall risk. (R. at 292). He went on to note Plaintiff "has a fair to good prognosis" and would benefit from therapeutic

7

exercise and activity in addition to his physical therapy. (R. at 298). He then recommended Plaintiff return to therapy three times per week for four weeks. (R. at 299).

On June 20, 2016, Plaintiff returned to physical therapy. (R. at 300). Plaintiff reported his pain was constant, unremedied by injections, and on that day a 5/10 in intensity. (R. at 300). Following the session, Plaintiff reported feeling looser, though he continued to display some trunk flexion, decreased weight bearing in his right leg, significant tightness in his right lumbar paraspinals, and antalgic gait. (R. at 300). Noting Plaintiff's lumbar and gluteal tightness responded well to therapy, the physical therapist scheduled a follow-up session. (R. at 300, 301).

The follow-up session occurred on June 22, 2016. (R. at 302). There, Plaintiff noted his back loosened after his previous session, but his pain returned, shooting down his lower back through his right leg to his ankle. (R. at 302).  On that day, Plaintiff claimed the intensity of his pain was 4/10. (R. at 302). Following treatment, the physical therapist noted Plaintiff reported decreased stiffness but nonetheless displayed an abnormal gait and "significant tightness" through his right leg. (R. at 302). Plaintiff then cancelled subsequent appointments without rescheduling (R. at 304), which he alleged was because the physical therapists were worsening the pain (R. at 43, 310).

On July 13, 2016, Plaintiff was denied Social Security disability benefits by the Social Security Commissioner, which considered Plaintiff's claims of "myalgia, myositis, disease of the lung, colonic polyps, sciatica, and degenerative disc disease." (R. at 80, 84). In its assessment, the Commissioner stated he believed Plaintiff

8

suffered from some conditions that limited his ability to function but that he believed Plaintiff could still perform "medium work." (R. at 84). While the Commissioner recognized Plaintiff would be unable to do certain kinds of labor, he found Plaintiff would be able to adjust to other occupations and made no finding on whether Plaintiff could do his past relevant work. (R. at 84).

On August 15, 2016, Plaintiff visited Dr. Jianxun Zhou for his back pain. (R. at 285). Plaintiff reported that up to that date, he had taken three epidural injections, which generally provided him three hours of relief; underwent physical therapy, which "made his pain worse;" and taken pain pills, which supplied "limited benefits." (R. at 285). Dr. Zhou noted Plaintiff suffered from "decreased range motion of the lumbar spine in all planes," increased pain when leaning forward, and a "tenderness to palpitation of [the] right L5-S1 and SI joint;" he also recorded a positive Patrick test on the right side.[6] (R. at 286). However, Dr. Zhou also noted Plaintiff had a normal gait, could toe and heel walk without problems, could "stand up from [a] chair without arm support," and showed "[n]ormal sensation, strength, and reflexes in bilateral lower extremities." (R. at 286). Ultimately, Dr. Zhou found Plaintiff to have "[c]hronic mechanic back pain" as a result of disc generation, facet arthropathy in his lower lumbar, and right SI joint dysfunction. (R. at 286). Dr. Zhou went further in noting Plaintiff was not an "appropriate surgical candidate" and should instead be

---

[6] A Patrick test is used to identify arthritis of the hip; it is conducted by having the patient lie supine, "the thigh and knee are [then] flexed and the external malleolus is placed over the patella of the opposite leg; the knee is [then] depressed, and if pain is produced, arthritis of the hip is indicated." *Test*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020). It is also referred to as "fabere sign," "from the initial letters of movements that are necessary to elicit it, namely, flexion, abduction, external rotation, extension." *Id.*

"managed conservatively with **_therapy_** and medication or injection." (R. at 286) (emphasis in original).

On August 30, 2016, Plaintiff again met with NP Schierer at PRM Pain Clinic. (R. at 310). Plaintiff reported he experienced no pain relief since his previous visit, physical therapy and home exercise worsened his pain, and his current pain intensity was 6/10. (R. at 310). Plaintiff also stated his physical functioning, mood, and sleep had all worsened since his last visit, but he did not notice any adverse side effects from his medications. (R. at 310). A physical examination revealed lower back pain, mild gluteal pain, and an antalgic gait. (R. at 313). Plaintiff also tested positive for pain due to straight-leg raising in the supine position, palpation over the right lumbar muscles, and facet loading and back extension and rotation. (R. at 313). However, there was no observed peripheral joint pain from movement. (R. at 313). At this point, Plaintiff's list of ongoing problems included lower back pain, history of colonic polyps, disease of the lung, myalgia, myositis, sciatica, tobacco use disorder, dyspepsia, degenerative disc disease, lumbar radiculopathy, lumbar facet arthropathy, sacroiliitis, and high-risk medications. (R. at 313–314).[7] In addition to his Flexeril and Valium, Plaintiff was prescribed Percocet. (R. at 311–12). Later, on September 7, 2016, Plaintiff received a lumbar facet medial branch diagnostic block injection from Dr. Gupta to help alleviate his pain. (R. at 314–15).

---

[7] Sacroiliitis is "inflammation in the sacroiliac joint." _Sacroiliitis_, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020). "Sacroiliitis can cause pain in [the] buttocks or lower back, and can extend down one or both legs. Prolonged standing or stair climbing can worsen the pain." _Sacroiliitis_, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747 (last visited June 9, 2020).

On September 13, 2016, Plaintiff met with NP Schierer. (R. at 315). Plaintiff claimed his previous injection only reduced his pain 15 percent for the first hour, but otherwise there had been no change. (R. at 315). He also noted his mood and sleep had worsened, and on that day, his pain intensity was 5/10. (R. at 315–16). Plaintiff reported no adverse side effects to his medications and stated he had quit smoking earlier that month. (R. at 316, 317). Diagnoses of vitamin D deficiency and dyslipidemia were added to the ongoing list of issues, and Zanaflex was added as a new prescription. (R. at 319–20).[8] Because his other prescriptions had ended, Plaintiff was only prescribed Percocet and Zanaflex at this point. (R. at 317). The physical examination otherwise produced very similar findings to the prior check-up. (R. at 313, 318, 319)

On October 21, 2016, Plaintiff had a follow-up appointment with NP Schierer where he reported worsening mood and sleep, no change in overall pain, current pain intensity of 6/10, and a 60 percent reduction in pain from medications without adverse effects. (R. at 320–21). His physical examination was largely consistent with prior ones; however, this time Plaintiff displayed a normal gait. (R. at 323). NP Schierer continued Plaintiff's medicine regimen and scheduled a follow-up appointment. (R. at 324).

The same day, the Social Security Commissioner denied Plaintiff's application for disability on reconsideration. (R. at 86). As in the Commissioner's initial determination, Plaintiff was found to have medical conditions that caused him some

---

[8] Dyslipidemia is an "abnormality in, or abnormal amounts of, lipids and lipoproteins in the blood." *Dyslipidemia*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/wsearch (last visited July 22, 2020).

restrictions, which prevented him from being able to perform certain jobs. (R. at 89). However, this time the Commissioner found Plaintiff only capable of doing "light work." (R. at 89). Nonetheless, without making a finding on Plaintiff's ability to do his past relevant work, the Commissioner determined Plaintiff could adjust to other areas of the workforce. (R. at 89).

The next appointment took place on November 18, 2016. (R. at 325). Plaintiff reported improved sleep, worsened mood, unchanged overall pain, current pain intensity of 6/10, and a 60 percent reduction in pain from medications without adverse side effects. (R. at 325). Again, the physical examination was largely consistent with the prior one, including normal gait and full peripheral range of motion. (R. at 328). Prescriptions were continued, and a follow-up appointment was recommended. (R. at 328, 329).

Throughout 2017, Plaintiff continued to receive treatment from NP Schierer. The medical reports show five total appointments, during which Plaintiff reported pain levels of 5–6/10, pain relief from his medication between at 50–80 percent without adverse effects (with an average of around 70 percent relief), full peripheral joint range of motion, and normal gait. (R. at 329, 332, 333, 334, 336, 337, 338, 340, 341, 342, 344, 351, 354). Plaintiff also reported his overall pain, sleep, mood, and physical function either did not change or worsened. (R. at 329, 333, 337, 338, 342, 351). During this time, Plaintiff's testing, diagnoses, and treatment remained consistent. (*See* R. at 332, 333, 336, 337, 340, 341, 344, 345, 354, 355).

On March 5, 2018, Plaintiff visited the emergency department of Unity Point Health for shoulder pain. (R. at 360). An X-ray resulted in a diagnosis of "[s]oft tissue

injury of [the] right shoulder, initial encounter." (R. at 360). No changes were made to Plaintiff's prescriptions as a result. (R. at 360).

On March 8, 2018, Plaintiff appeared before an ALJ to testify about his condition. (R. at 30). He was represented by an attorney, and a VE was present to testify. (R. at 30).

Plaintiff testified his degenerative disc disease felt like "a fist" in his right lower back with pain radiating from his back, through his gluteus, and down to his right heel. (R. at 40). Further, his sciatica, always present in the right leg, had started to affect his left leg on occasion as well. (R. at 44–45). As a result, Plaintiff stated he had about three good days a month, but the rest were "hurting days," some of which immobilized him completely. (R. at 47–48).

Speaking to his general activity level, Plaintiff alleged the condition prevented him from "bending, stooping, lifting, sitting for long periods, standing for long periods, [and] walking for long distances." (R. at 39). Plaintiff stated he could only bear to sit or stand continuously for 15–20 minutes. (R. at 41, 43). Consequently, Plaintiff claimed, he was unable to work or volunteer since his alleged onset date. (R. at 38–39). Plaintiff claimed his conditions severely hampered other basic activities as well. He stated he was unable to ride in a car for long distances without a break every 15–20 minutes, his dependent 15-year-old son did most of the household chores, his 25-year-old daughter mowed the yard and did laundry, his son grabbed groceries from the shelves while he drove the cart, and he could no longer enjoy his hobbies of riding boats, jet skis, and motorcycles. (R. at 43, 44, 46). Plaintiff described his day as being spent "[o]n meds and napping," often alternating between sitting and trying to walk

around while he is awake. (R. at 47). Plaintiff noted he does not have a license to drive a car due to a DUI that occurred many years ago, but since then he has given up both drinking and smoking. (R. at 44, 46).

Plaintiff claimed many aspects of his health have suffered secondary to his back conditions. Due to his low level of activity, Plaintiff noted he weighed 255 pounds with a height of 5 feet 11 inches. (R. at 36). He claimed he had recently lost 30 pounds despite no change in physical behavior or eating habits, and his normal weight was 215 pounds. (R. at 37, 48). Plaintiff also alleged his personal hygiene tasks take a long time to accomplish—his baths often take 40 minutes because his legs fall asleep once he enters the tub and shaving and dressing also take a while to accomplish. (R. at 47).

Speaking to his most recent injury, which had occurred mere days before the hearing, Plaintiff stated he fell backwards because his leg gave out. (R. at 49). On this occasion, he allegedly hit a bedframe on the way down, which resulted in a diagnosis of "soft tissue injury of the right shoulder." (R. at 49, 360). Plaintiff claimed the injury caused popping, cracking, and a great deal of pain. (R. at 49). The X-ray results from his emergency room visit were not available at the hearing, and he had not yet been referred for an MRI. (R. at 50). Plaintiff also alleged falls from his condition were fairly common and, although available medical records do not evidence it, have caused sprained ankles, torn knee ligaments, and the need for a tetanus shot in the past. (R. at 49–50).

It was noted Plaintiff had tried various remedies, but none seemed to work. He alleged epidural shots relieved the pain for about four hours but then resulted in

soreness for three days (R. at 42); physical therapy worsened his pain (R. at 43); Neurontin (gabapentin) led to adverse reactions (R. at 45–46); and his current opiate and muscle relaxer regimen created nausea and drowsiness, often necessitating naps during the day (R. at 45, 55–56). Additionally, although there are no mentions of one in the medical record, Plaintiff referenced use of a cane at his home. (R. at 49).

The VE then testified to the classification of Plaintiff's work and other suitable jobs available in the national economy. (R. at 51). He stated the Dictionary of Occupational Titles (DOT) rated Plaintiff's previous job at a skill level of five, light intensity level as defined, but medium intensity as described by Plaintiff. (R. at 52). In a hypothetical in which a person with the same characteristics as Plaintiff had the residual functional capacity (RFC) to perform light work and was restricted from certain hazardous situations (no ladders; occasional stairs; rare taxing environments; infrequent unprotected heights; and only occasional balancing, stooping, kneeling, crouching, and crawling), the VE stated the hypothetical individual would be able to perform Plaintiff's old job as defined by the DOT but not as Plaintiff described. (R. at 52–53). With the same hypothetical person doing sedentary work, having to move around every 30 minutes, and remaining on task at his work station, the VE said Plaintiff's old job would be infeasible; however, he did note about three other jobs (stamper, information checker, and document preparer) would be feasible, and roughly 27,000 of those jobs were available in the national economy. (R. at 53–54). This would not change if the amount of time between movements were reduced to 15 minutes. (R. at 54). However, the VE further testified there would be no competitive employment in the national economy if this same hypothetical person, having to

switch between sitting and standing every 15 minutes, had to be absent from work three days per month. (R. at 54–55). The same would be true if that hypothetical individual would be off task at least 20 percent of the workday. (R. at 55).

Ultimately, the ALJ concluded Plaintiff was not disabled. (R. at 18–19). The ALJ did find Plaintiff's degenerative disc disease, obesity, and history of lung disease could be classified as medically determinable severe impairments under 20 C.F.R. 404.1520(c), but he did not find Plaintiff's new shoulder injury qualified. (R. at 18). The ALJ found none of Plaintiff's impairments, or combination of impairments, met one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. at 18). The ALJ concluded Plaintiff could not perform his past relevant work but could adjust to other work that exists in significant numbers in the national economy. (R. at 21–22). In making this finding, the ALJ made the following RFC determination:

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can only occasionally climb ramps and stairs, and can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and/or crawl. He must avoid more than occasional exposure to unprotected heights, moving mechanical parts, humidity and wetness, pulmonary irritants such as dusts, fumes, odors, and gases, extreme cold, extreme heat, and vibrations. Finally, he must be allowed to alternate between sitting and standing every 15 minutes, while remaining at his workstation and on-task.

(R. at 18–19).

LEGAL STANDARD

## I.  Disability Standard

To qualify for disability benefits under the Social Security Act, a claimant must prove he is "disabled," which is defined as someone unable "to do any substantial gainful activity by reason of any medically determinable physical or mental

16

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 404.1509. The disability must be caused by a severe impairment, and the impairment must render the claimant unable to do his "past relevant work . . . or any other substantial gainful work that exists in the national economy." § 404.1505(a); *see also* § 404.1566. In the context of the Social Security Act, "past relevant work" means "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it," and "substantial gainful activity" means work involving "significant and productive physical or mental duties" for pay or profit. §§ 404.1510, 404.1560.

With respect to a claim for a period of disability and disability insurance benefits, a claimant must also demonstrate his or her earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits, and the alleged disability began on or before the date that insurance coverage ended. 42 U.S.C. §§ 416(i)(3), 423(c)(1).

Upon receiving a claim for disability benefits under the Social Security Act, the Commissioner conducts a five-step analysis to determine whether the claimant is disabled under the Act and therefore entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1); *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).

At the first step, the Commissioner determines the claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the Commissioner finds the claimant is engaged in substantial gainful activity, the claimant will be deemed not disabled; otherwise, the Commissioner will move to the second step. *Id.*

At the second step, the Commissioner evaluates the severity and duration of the claimant's impairment(s). 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment that "significantly limits [his or her] physical or mental ability to do basic work activities," the Commissioner will proceed to the third step. § 404.1520(c). However, if the claimant's impairments, considered in combination, are not severe, he or she is not disabled, and the inquiry ends. *Id.*

At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the elements of one of the listings are met or equaled by the claimant's impairment(s), the claimant is eligible for disability benefits and the inquiry ends. *Id.* If the claimant does not qualify under one of the listings, the Commissioner proceeds to the fourth and fifth steps after determining the claimant's RFC. § 404.1520(e).

A claimant's RFC is "the most [a claimant] can still do despite [his or her] limitations," including the claimant's physical, mental, and sensory abilities. 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, the Commissioner must consider all the relevant evidence in his or her case record. *Id.*

After determining the claimant's RFC, the Commissioner moves to the fourth step of the analysis. 20 C.F.R. § 404.1520(e). There, the Commissioner determines if the claimant's RFC will allow performance of his or her past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is deemed not disabled. *Id.* If not, the Commissioner moves to the fifth step. § 404.1520(e).

At the fifth step, the Commissioner evaluates the claimant's ability to perform other substantial gainful activity given his or her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If an adjustment can be made, the claimant will be found not disabled; if not, the claimant will be deemed disabled and therefore entitled to disability benefits. *Id.*

The claimant bears the burden of production and persuasion at the first four steps of the Commissioner's analysis. 20 C.F.R. § 404.1512(a)(1); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). However, once the claimant demonstrates an inability to perform any past relevant work, the burden shifts to the Commissioner to show the claimant's ability to engage in another type of gainful employment. § 404.1512(b)(3); *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018).

## II.    Standard of Review

When a claimant seeks judicial review of an ALJ's decision denying disability benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004). The ALJ's legal conclusions are reviewed by the Court *de novo*, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008), while the ALJ's factual findings are governed by 42 U.S.C. § 405(g), which states: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v.*

*Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (internal quotation marks and citation omitted)).

In a substantial-evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion" but need not address every piece of evidence. *Id.* at 872.

## DISCUSSION

The two issues Plaintiff raises in his Memorandum for Summary Remand are (1) "[w]hether the ALJ improperly discounted [his] subjective symptom allegations" and (2) "[w]hether the ALJ inadequately assessed [his] RFC." (Doc. 19 at 6). The Court will address each in turn.

## I.   The ALJ improperly discounted Plaintiff's subjective symptom allegations.

In order to discount a claimant's testimony about his physical condition, an ALJ must conclude the claimant is not credible. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)). Because an ALJ is in the best position to determine a claimant's credibility, his or her determination is reviewed deferentially and is only overturned if it is clearly wrong or insufficiently supported. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). To properly support a credibility determination, an ALJ must provide specific reasons and substantial evidence for his or her decision. *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007) (citing *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). An

ALJ is not required to address every piece of information in the record, *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994), but the ALJ must consider all relevant evidence and state the reasons for his or her conclusions in a way sufficient to inform a fair review, *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988). This, at minimum, requires a base level of analysis of all relevant evidence opposing the ALJ's decision such that a reviewing court can ensure that evidence was accounted for and understand why it was rejected. *Zblewski*, 732 F.2d at 79. If an ALJ fails to meet any of the above criteria, a remand is necessary "unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Here, the ALJ largely discounted Plaintiff's allegations about his symptoms when determining his RFC. In doing so, the ALJ noted Plaintiff's "statements about the intensity, persistence, and limiting effects" of his symptoms were "somewhat inconsistent because they are not supported by the weight of the medical evidence of record, or by objective medical imaging or testing, or by the type and level of treatment and diagnostic procedures given to the claimant." (R. at 19–20). Plaintiff argues the case should be remanded because the ALJ did not sufficiently address the evidence supporting Plaintiff's claim or adequately explain why he felt some evidence was inconsistent with Plaintiff's allegations. The Court agrees the ALJ did not adequately assess all of the relevant evidence that supported Plaintiff's allegations such that a meaningful review could be conducted; therefore, the case must be remanded.

The Court first notes the evidence listed by the ALJ. The ALJ's decision documented a significant portion of Plaintiff's allegations, including: inability to stand more than 10 minutes without severe back pain and leg numbness; discomfort from sitting in the same position for long periods; lack of sleep; frequent daytime naps "due to fatigue and pain;" "difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using his hands;" loss of balance when reaching overhead; use of a cane to walk; and use of a cart to grocery shop.  (R. at 19).

The ALJ then contrasted Plaintiff's numerous allegations with the medical record. The ALJ cited X-ray and MRI imaging showing "mild degenerative change" and "no overt central stenosis." (R. at 20) (internal quotations omitted). The ALJ also cited Plaintiff's initial consultation with his pain management physician, who stated Plaintiff was a "good candidate for interventional pain management with injections, medications, and physical therapy or home exercise." (R. at 20). (internal quotations omitted). The ALJ next cited the assessment of Plaintiff's physical therapist, who found only moderate limitations from back pain, some issues with impaired range of motion, and moderate issues with sitting and standing. (R. at 20). The ALJ also noted Plaintiff "was not compliant with treatment" because he cancelled his future appointments after only three physical therapy sessions. (R. at 20).  The ALJ took note of Plaintiff's consultation with a neurosurgeon, who found "no muscle atrophy, intact ability to stand without arm support, a normal gait, ability to toe/heel walk, . . . normal sensation, strength, and reflexes in the . . . bilateral lower extremities." (R. at 20). The neurosurgeon also recommended a return to the pain clinic to pursue

conservative treatment consisting of physical therapy, medication, injections, and/or a spinal cord stimulator. (R. at 20–21).

Concerning Plaintiff's medications, the ALJ recorded Plaintiff's claims that his opioid pills provided 60 and 80 percent pain relief on separate occasions. (R. at 21). Looking to the state medical consultants, the ALJ cited their opinion "[C]laimant was capable of light work with some limitations." (R. at 21). Throughout the opinion, the ALJ noted findings of normal gait, the choice of conservative treatment by physicians, and a lack of evidence for certain claims (no evidence of treatment prior to December 2015, no prescriptions for or mentions of a cane during medical appointments, and no trips to the emergency room since the alleged onset date). (R. at 20–21).

The ALJ did make some references to medical evidence that supported Plaintiff's claims. At the outset, the ALJ addressed Plaintiff's obesity by citing his high body mass index. (R. at 20). He also made note of MRI results that showed "narrowing of the thecal sac" and "bilateral neuroforaminal stenosis" at the L3–L4 vertebrae. (R. at 20). Regarding the neurosurgeon consultation, the ALJ cited "decreased range of motion of the lumbar spine in all planes" and "tenderness to palpation on the right side." (R. at 20). The ALJ also included Plaintiff's claims that epidural injections did not help with his pain and that his lumbar facet medial branch diagnostic block procedure did not significantly reduce his discomfort. (R. at 20, 21).

Considering all this, the ALJ found there was not enough consistency between the medical record and Plaintiff's allegations of severe back pain to support an RFC precluding sedentary work. (R. at 21). The ALJ did, however, find enough evidence to support an RFC more restrictive than that recommended by the state medical

consultants. (R. at 21). Notwithstanding, the ALJ failed to include significant evidence that would support Plaintiff's claim; without inclusion and assessment of that evidence, a fair, meaningful review cannot be conducted. *Herron*, 19 F.3d 329 at 333 (stating an ALJ must consider all relevant evidence in the record and provide a clear analysis of that evidence).

To start, the ALJ cited physician impressions of Plaintiff's X-ray and MRI, both of which found mild degenerative change. (R. at 20) (citing R. at 263, 273). In addition, the ALJ also noted the MRI showed the deterioration was "most pronounced at L3– L4 where there is narrowing of the thecal sac," bilateral neuroforaminal stenosis at L3–L4, but no overt central stenosis. (R. at 20) (quoting R. at 273) (internal quotation marks omitted). Plaintiff first argues the ALJ confused his MRI with his X-ray images, and as a result, the ALJ erroneously attributed his pain management physician's comment about "mild degenerative changes" to the MRI when it really described the X-ray. (Doc. 19 at 6–7). Plaintiff is correct that the physician's note was actually about the X-ray since the MRI results were not yet available, (*see* R. at 269); however, the Court agrees with the Commissioner that the ALJ's error was harmless (Doc. 23 at 4–5). Regardless of what test the physician cited, he nonetheless made note of "mild degenerative changes" based on medical imaging. (R. at 269). Further, as noted above, both the X-ray and MRI resulted in physician impressions of mild degenerative changes. (R. at 263, 273).

More concerning is what the ALJ left out of his analysis of the medical imaging, including findings of small disc bulges at three separate vertebrae levels and a "somewhat congenitally narrow central canal due to short pedicles which exacerbates

the effects of the relatively minimal degenerative change." (R. at 273). These findings lend credence to Plaintiff's claims, and without citation to them, the Court cannot be sure if or how they were accounted for by the ALJ; this is required for a meaningful review. *See Orlando*, 776 F.2d at 213.

Similarly, the ALJ made no mention of a number of Plaintiff's relevant diagnoses in the medical record. Even if degenerative disc disease, lower back pain, obesity, and sciatica were the only issues raised by Plaintiff's attorney at the hearing (R. at 35, 36, 44), it is the job of the ALJ to consider the entire medical record in drafting his conclusion, SSR 16-3P. Indeed, the only back-related diagnoses the ALJ mentioned in his decision beyond those found by the medical imaging are degenerative disc disease and obesity. (R. at 20). Yet, the medical record shows Plaintiff was also diagnosed with a number of other ailments involving back and leg pain, including myalgia, myositis, sciatica, lumbar radiculopathy, lumbar facet arthropathy, and sacroiliitis. (R. at 313–14, 319). The Court recognizes the ALJ did cite the findings of medical professionals who would have had access to Plaintiff's various diagnoses.[9] (R. at 20, 21). However, the ALJ cannot reject evidence that is unmentioned in his decision. Even if the treating physicians made numerous observations unfavorable to Plaintiff, the omitted diagnoses are certainly relevant pieces of evidence beneficial to Plaintiff's argument; thus, they should have been

---

[9] The Court agrees with the Commissioner that it cannot be said, as Plaintiff alleges, the ALJ used his lay impressions of the medical evidence when he quoted medical professionals' statements. (Doc. 23 at 5) (citing *Rebecca A. P. v. Comm'r of Soc. Sec.*, 19-CV-430, 2020 WL 869396, *8 (S.D. Ill. Feb. 21, 2020)). Indeed, it would seem reasonable for the ALJ to cite these medical professionals' findings and observations to reject the alleged severity of Plaintiff's numerous diseases.

subjected to some minimal level of analysis by the ALJ in order to allow for a fair review. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Further, independent of the X-Ray and MRI, the ALJ did not mention any of the diagnostic tests conducted by Plaintiff's nurse practitioner and pain management physician—the most common medical examiners in the record—other than noting their frequent observations of normal gait. All of the tests that confirmed Plaintiff's allegations of pain were left out of the ALJ's decision. These include five observations of antalgic gait (R. at 259, 300, 302, 313, 319), four positive straight-leg tests (R. at 249, 274, 313, 318), multiple instances of pain to palpitation over the lumbar and paraspinous muscles (R. at 269, 274, 293, 300, 302, 313, 318, 354), and a positive Patrick test (R. at 286).

The Commissioner argues these omissions are inconsequential given the relative paucity of tests that lend support to Plaintiff's claims. (Doc. 23 at 3–4). It is true, as the Commissioner points out, there were a number of diagnostic tests that disfavored Plaintiff: twelve of the seventeen gait observations were normal (R. at 249, 255, 269, 274, 286, 323, 328, 332, 336, 340, 344, 354), and two straight-leg tests were negative (R. at 269, 354).  However, an ALJ is required to assess all of the relevant evidence in the medical record, and the evidence that runs counter to the ALJ's conclusion must be considered relevant. *Denton*, 596 F.3d at 425. By only citing the "frequent medical observations of normal gait" without at least mentioning these

other positive tests, a reviewing court cannot be sure the ALJ took them into consideration. (R. at 20). Indeed, it would be patently wrong if the ALJ concluded Plaintiff's treating physicians observed no signs of pain that might be consistent with Plaintiff's allegations.

The Court also agrees with Plaintiff that the above evidence ought to be included in the ALJ's analysis of listed impairments. Listing 1.04(A) describes disorders of the spine or spinal cord, which requires:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 104(A); (Doc. 19 at 8). Even though Plaintiff's own attorney stated nothing in the record met a listing (R. at 35–36), the ALJ was still required to make a finding on the issue and, in doing so, consider all of the criteria favorable to Plaintiff. *Ribaudo v. Barnhart*, 458 F.3d 580, 583–84 (7th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(iii).

The ALJ bluntly stated the "medical evidence of record does not document any nerve root compression." (R. at 18). However, some of Plaintiff's unmentioned diagnoses such as radiculopathy and sciatica involve some neuro-anatomic distribution of pain, *see* n.2, *supra*, and the medical record clearly documents positive straight-leg tests (R. at 249, 274, 313, 318). This is not to say that Listing 1.04(A) is clearly met; the ALJ cited of medical evidence that undermines such a claim, including MRI findings of "mild degenerative change" and "no overt central stenosis" as well as a neurosurgeon's assessment of "no muscle atrophy, intact ability to stand

without arm support, a normal gait, ability to toe/heel walk . . . , normal sensation, strength, and reflexes in the claimant's bilateral lower extremities." (R. at 20). However, because some of the omitted pieces of the medical record met the Listing 1.04(A) criteria, that evidence should have been included somewhere in the decision.

Plaintiff also contends the ALJ improperly considered his lack of treatment prior to December 2015, non-compliance with physical therapy, and use of a cane as being inconsistent with his allegations. (Doc. 19 at 9, 10, 12). The Court agrees. It is true there is no evidence of Plaintiff seeking medical care for his back pain until December 2015 despite his alleged onset date being in 2013, Plaintiff ceased going to physical therapy after three sessions despite reports of improvement, and Plaintiff alleged he uses a cane despite not bringing one to his hearing and there being no mention of a cane in his medical records. (R. at 20). In assessing credibility, an ALJ may find a claimant's failure to seek help or noncompliance with treatment to be inconsistent with a claimant's assertions. SSR 16-3P. However, to find an inconsistency, an ALJ must consider the possible reasons for the absence of treatment or non-compliance by citing medical records, contacting the claimant, or inquiring about it at a hearing. *Id*. The ALJ must then explain how the claimant's explanations were considered in the evaluation of his or her symptoms. *Id*.  Here, the ALJ did inquire into Plaintiff's explanations for not continuing physical therapy at the hearing (the physical therapist was hurting him), but he did not ask why Plaintiff did not seek medical help prior to December 2015 or why he started using a cane. (R. at 30–58). Nowhere in the decision does the ALJ discuss Plaintiff's reasons for ending his physical therapy sessions and not seeking treatment earlier.

Without doing so, the ALJ was barred from finding Plaintiff's lack of treatment, noncompliance with physical therapy, or use of a cane as being inconsistent with his allegations.

For the above reasons, the Court finds the ALJ's credibility analysis incomplete, and thus remands for a fuller analysis of the evidence in the record that supports Plaintiff's allegations. First, however, a few arguments made by Plaintiff are worth dispelling.

Considering Listing 1.04(A), Plaintiff argues that while the "MRI did not explicitly find nerve root compression . . . the neuroforaminal narrowing and [Plaintiff's] neuro-anatomic distribution of pain . . . suggest that it has occurred," and the ALJ was required to consider this. (Doc. 19 at 8). However, it is well-established that an ALJ may not go beyond medical imaging and professional medical assessments to make his own diagnoses. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("The Commissioner's determination must be based on testimony and medical evidence in the record. And, as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Although the ALJ should have included all of the evidence supporting the 1.04(A) criteria, he was not required—or permitted—to draw further inferences from that evidence.

Additionally, Plaintiff argues the ALJ did not acknowledge he was unable to tolerate certain medications. (Doc. 19 at 10). Yet, it does not appear the ALJ held this against Plaintiff. Rather, the ALJ noted Plaintiff claimed his epidural injections and lumbar facet medial branch diagnostic block were ineffective, so his physicians

prescribed opioid medications. (R. at 20, 21). The ALJ then stated the opioid medications seemed to mitigate the pain to a point beneath the chronic, disabling agony alleged by Plaintiff. (R. at 21). In support of this contention, the ALJ noted Plaintiff reported his opioids provided 60 and 80 percent pain relief on separate occasions without adverse effects. (R. at 21). Plaintiff claims these data points were selective, leaving out other reports of relief, current pain levels, and worsening pain. (Doc. 19 at 12). As previously noted, it is true an ALJ must address all relevant evidence and may not cite only those details supportive of his conclusion. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). However, unlike the aforementioned diagnoses and medical tests, it is not clear citing all of the points regarding Plaintiff's pain relief would have helped Plaintiff's cause. Of the medical appointments on the record since Plaintiff was prescribed Percocet in August of 2016, Plaintiff reported the following to his nurse practitioner:

| Date | 9/13/16 | 10/21/16 | 11/18/16 | 1/25/17 | 3/28/17 | 6/28/17 | 9/29/17 | 12/28/17 |
|---|---|---|---|---|---|---|---|---|
| Pain Relief % | 15 | 60 | 60 | 65–70 | 80 | 75 | 75 | 50 |
| Current Pain (0–10) | 5 | 6 | 6 | 5 | 6 | 5 | 5 | 6 |
| Pain Trend | Stable | Stable | Stable | Stable | Worse | Stable | Stable | Worse |
| Adverse Effects of Medicine | None | None | None | None | None | None | None | None |
| Citation to Transcript | R. at 315, 316 | R. at 320, 321 | R. at 325 | R. at 329 | R. at 333, 334 | R. at 337, 338 | R. at 341, 342 | R. at 351 |

The ALJ was not required to cite or explain all of these data points. *Herron*, 19 F.3d at 333. Instead, the ALJ was required to show he considered this evidence, articulate his reasons for rejecting Plaintiff's allegations, and provide substantial evidence for that determination such that a meaningful review could be conducted. *Orlando v. Heckler*,

776 F.2d 209, 213 (7th Cir. 1985). The ALJ met that standard regarding the effectiveness of Plaintiff's medications.

Plaintiff also argues the ALJ mischaracterized his physicians' recommendations for conservative treatment as being inconsistent with claims of severe pain. (Doc. 19 at 11). Specifically, Plaintiff contends the ALJ improperly found incongruence between allegations of disabling pain and a neurosurgeon's report, which concluded Plaintiff was not an appropriate surgical candidate and that he should instead be managed conservatively. (Doc. 19 at 10, 11). Indeed, an ALJ must consider if a claimant's course of treatment is the result of a medical source advising him or her "there is no further effective treatment to prescribe or recommend" that would provide a benefit. SSR 16-3P. However, Plaintiff's argument suggests the ALJ focused only on the neurosurgeon's recommendation of conservative treatment, which he did not. Rather, reading the ALJ's decision as a whole, the ALJ's determination that Plaintiff's "largely conservative" treatment was "inconsistent with allegations of extreme limitations" came immediately after the ALJ discussed the neurosurgeon's findings of "no muscle atrophy, intact ability to stand without arm support, a normal gait, ability to toe/heel walk, decreased range of motion of the lumbar spine in all planes, tenderness to palpitation on the right side, and normal sensation, strength, and reflexes in [Plaintiff's] bilateral lower extremities." (R. at 20, 21). These findings, along with the results of Plaintiff's opioid medications, provide the logical bridge and minimal analysis required to support the ALJ's conclusion that the treatment Plaintiff received, and its effectiveness, are inconsistent with Plaintiff's allegations of extreme, disabling pain.

## II.    The ALJ reached an inadequate RFC assessment.

An RFC is an administrative determination of an "individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis." SSR 96-8P (emphases in original). When determining a claimant's RFC, the ALJ "must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In assessing a claimant's allegations, an ALJ must draw a logical bridge from the evidence to his or her conclusion. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

Because the Court has determined the ALJ's credibility determination requires more supporting detail, it follows that the ALJ's RFC assessment, which rests largely on his credibility analysis, also requires a more thorough explanation. However, Plaintiff raises additional arguments that the ALJ did not sufficiently address all of Plaintiff's limitations supported by the record or explain how he accommodated them.

Plaintiff first contends the ALJ did not adequately explain how he accounted for his fatigue in his RFC assessment. (Doc. 19 at 13–14). This is particularly important because Plaintiff's RFC requires him to remain on-task at his workstation, but the vocational expert stated a hypothetical person with Plaintiff's symptoms and RFC would not be able to find competitive employment if he were off task at least 20 percent of the day. (R. at 18–19, 55). Plaintiff did allege his medications caused fatigue and nausea during his hearing (R. at 41, 45), and there

is one point in the medical record, apart from the notes about no adverse side effects from medications, where Plaintiff's nurse practitioner recorded "mild drowsiness" as an experienced side effect of Percocet (R. at 336). Additionally, the medical record shows multiple reports of Plaintiff's worsening overall sleep. (R. at 310, 316, 321, 342, 351). The ALJ noted Plaintiff claimed he "must take naps during the day due to fatigue and pain" (R. at 19), and he also stated, accurately, the medical record states Plaintiff experienced no adverse effects as a result of his Percocet medication (R. at 21). However, the Court agrees that more explanation was needed. The ALJ did not explain Plaintiff's alleged necessity to occasionally take naps was a result of his prescribed medications; if true, these naps would likely have to continue so long as Plaintiff's physicians prescribe Percocet. The ALJ also failed to explain whether he disbelieved Plaintiff's allegations of fatigue completely or if he felt the fatigue was mild enough that Plaintiff could last an entire workday on-task. Without this explanation, a reviewing court cannot be sure if or how Plaintiff's fatigue was accounted for in his RFC. SSR 96-8P ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

Plaintiff also alleges the ALJ did not properly explain his limited ability to sit or stand for long periods of time or find his claims unsupported by the medical record. (Doc. 19 at 14). This too is important because Plaintiff's RFC requires him to be able to "alternate between sitting and standing every 15 minutes, while remaining at his workstation and on-task." (R. at 19). The ALJ cited Plaintiff's claims of being unable to stand more than 10 minutes without severe pain, having to change positions every

33

30 minutes due to discomfort, and only being able to ride in a car for around 20 minutes before the onset of pain. (R. at 19). The Court notes Plaintiff also testified he could sit or stand for 15–20 minutes before having to change position. (R. at 41, 43). However, the ALJ spent a large portion of his decision citing evidence that undercut Plaintiff's claims of severe, disabling pain that might preclude him from working an entire shift, including the pain-alleviating effects of Plaintiff's medications, observations of treating physicians, and conclusions of state medical consultants. (R. at 20–21). The Court can easily follow the ALJ's reasoning for the limitations placed on Plaintiff's sitting and standing in his RFC. Thus, the only conceivable inconsistency is the assumption that Plaintiff can remain on task while adjusting his position throughout the workday. The ALJ should address that point on remand.

Plaintiff next argues the ALJ did not adequately explain how he accommodated his obesity in his RFC. The Court disagrees. The ALJ stated he considered the condition in the context of the overall record pursuant to the guidelines set forth in SSR 02-1p and found the medical evidence did not establish the "excess weight would cause any relevant listing to be met or medically equaled." (R. at 18). Beyond mentioning the trend of Plaintiff's body mass index, the ALJ did not provide any analysis of how he factored Plaintiff's obesity into his RFC. (R. at 20). However, apart from Plaintiff's own claims and his body mass indices, the medical record is largely void of other evidence to which the ALJ could cite in his explanation. Instead, the ALJ described the findings of physicians and state medical consultants that showed normal gait, moderate limitations with movement, and an

ability to perform light work with some restrictions. (R. at 20, 21). Plaintiff's obesity would have been a factor during all of these examinations. Given the available evidence, this was sufficient to explain the ALJ's reasoning. Further, taken in the context of the medical professionals' observations, it is not clear how Plaintiff's obesity is at odds with a sedentary RFC.

Lastly, Plaintiff contends the ALJ did not adequately evaluate whether his new shoulder injury could be expected to last up to 12 months and thus be considered a severe medical impairment or assess how his shoulder injury would affect his RFC. (Doc. 19 at 14–15). The ALJ only stated Plaintiff's shoulder injury did not meet the 12-month durational requirement to be considered a severe medically determinable impairment but that the injury "has nonetheless been accommodated by the sedentary residual functional capacity." (R. at 18). While boilerplate language that fails to link conclusions to objective evidence usually does not suffice as a reasonable explanation for an ALJ's determination, *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013), the Court fails to see how, in this particular case, the ALJ's analysis was unacceptably lacking or how the RFC conclusion was inconsistent with the medical evidence. At the time of the hearing, Plaintiff's shoulder injury was less than a week old, tests had only revealed a soft tissue injury, X-ray results were not available, and Plaintiff had not yet been referred for an MRI. (R. at 50, 360). There simply was very little in the record for the ALJ to consider, and any prediction by the ALJ that the new soft tissue injury would severely impact Plaintiff for a year would be unsupported by objective medical evidence. Further, Plaintiff claimed his shoulder

"pops and cracks and hurts badly" when he rotates it, but it is hard to see how such symptoms are inconsistent with a sedentary RFC. (R. at 51).

To conclude, the Court finds the ALJ did not sufficiently assess all relevant evidence. Because the ALJ's credibility analysis requires a more thorough explanation, his RFC determination cannot be considered sound. Apart from revisiting his credibility evaluation and applying it to the RFC analysis, the Court also finds the ALJ must provide clearer explanation for whether Plaintiff can stay on task for an entire workday and how that finding has been factored into his RFC.

## CONCLUSION

After careful review of the entire record, the Court concludes the ALJ's decision requires a more thorough evaluation of the evidence supporting Plaintiff's claim, a clearer explanation of whether Plaintiff can stay on task for an entire workday, and how that finding has been factored into his RFC. The Court therefore GRANTS Plaintiff's Motion for Summary Remand (doc. 18) and DENIES Defendant Commissioner's Motion for Summary Affirmance (doc. 23). This case is REMANDED to Administrative Law Judge John P. Mills III for further proceedings consistent with this decision.


SO ORDERED.

Entered this 3rd day of August 2020.


s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
